621 So.2d 649 (1993)
Jimmy G. MANCHACK, et ux., Plaintiffs-Appellants,
v.
WILLAMETTE INDUSTRIES, INC., et al., Defendants-Appellees.
No. 24599-CA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 1993.
Rehearing Denied August 12, 1993.
*650 Seale, Stover, Coffield & Bisbey by Blair A. Bisbey, Jasper, for plaintiffs-appellants.
Bodenheimer, Jones, Klotz & Simmons by Harry D. Simmons, Shreveport, for defendants-appellees.
Before NORRIS, LINDSAY and VICTORY, JJ.
LINDSAY, Judge.
Truck driver Jimmy Manchack and his wife appeal a judgment dismissing their claim against Willamette Industries, Inc., and its insurer, Safeco Insurance Company of America, for personal injuries sustained in a slip and fall on Willamette's premises. For the following reasons, we affirm the judgment of the trial court.

FACTS
The accident occurred at Willamette's Surepine plywood plant in Simsboro, Louisiana, at around 8 p.m. on January 18, 1990. Mr. Manchack, a truck driver employed by Combs Enterprises of Henderson, Texas, was delivering wood chips to the plant. On entry he stopped to weigh his load, as he had done on his five or six prior trips to the plant.
The truck scale is built into the concrete driveway just inside the plant entrance. It forms a rectangular outline on the left side (from the entering driver's vantage point) of the pavement. The left edge of the scale is 8½" from a concrete curb that stands almost 17" high. The side of the curb that faces the scale slants at about a *651 45° angle, the other side is perpendicular to the ground, and the very top has a flattened ledge about 4" wide.
When a driver parks his rig on the scale, he must walk to a guard house located on the other side of the curb and slightly behind the front of the trailer. Apparently some drivers, after alighting from their cabs, walk around the front of the curb and backtrack to the guard house, as evidenced by a worn path in several photos admitted into evidence. Drivers can also walk down a narrow path between the rig and the curb until they reach the guard house; then they can grasp a handle on the guard house door to aid in stepping over the curb and into that door. However, some drivers utilize a more direct route, stepping over the curb immediately after exiting the cab, and then using a portion of the path to the guard house. Once inside the guard house, the driver fills out some paperwork, then returns to his rig and delivers the load; afterwards, he weighs the empty trailer.
Although Mr. Manchack characterized the lighting on the night of the accident as "kinda poor," he testified that he could clearly see the curb. He also observed that the curb was still wet from a rain earlier in the day. Mr. Manchack stepped out of his cab and onto the pavement. He placed his left foot on the slanted top of the curb and started to hoist himself up. When he had nearly raised himself all the way, his left foot slipped off the curb, and he fell, striking his right knee against the curb. He got up, went to the guard house and told the guard about the accident. The guard, Willie Williams, did not see the accident, but he verified that Mr. Manchack entered the guard house and reported that he had fallen and injured his knee. Thereafter, Mr. Williams filled out an accident report.
Mr. Manchack then went back to his truck and delivered the wood chips. After this he returned to the scale to log his empty weight. Several Willamette supervisors, including production supervisor Don Small, had heard about the accident and met Mr. Manchack at the guard house. They offered to take him to the hospital, but Mr. Manchack declined.
Mr. Manchack admitted that he had crossed the curb on several prior occasions by stepping on top of it and down onto the dirt path, but he had never slipped off before this incident. He further testified that he could plainly see the curb and he realized that it was wet. He also testified that the curb was too high to step over. He further testified that when he first reported the accident, a guard (whose name he did not know) remarked, "Well, somebody finally fell. Maybe they'll put some steps in now."
As a result of his knee injury, Mr. Manchack has undergone two arthroscopic surgeries and has a permanent disability. He also faces the prospect of future surgery and, ultimately, a knee replacement. Before trial, the parties entered a stipulation whereby Willamette did not admit liability, but set Mr. Manchack's damages at $250,000, subject to reduction for plaintiff fault, and guaranteed him the sum of $15,000, regardless of the outcome of the trial. Mr. Manchack waived all but post-judgment interest in the event that he appealed the judgment. Thus, the bench trial was limited solely to the issue of liability.
At trial the parties stipulated that the truck scale had been in place for approximately 20 years. It was also stipulated that Willamette's purchasing agent and the office manager, who would have been informed of any accidents because of the nature of their jobs, were not aware of any similar incidents in those 20 years.
The parties further stipulated that in 1991 (the year after Mr. Manchack's accident), Willamette received 9,696 deliveries of raw material and particle board (a total of 19,392 weigh-ins) without a single accident. However, the company's divisional purchasing agent, Tommy Jackson, testified by deposition that in 1990 the scale was overhauled. Responses to discovery requests and photos in evidence show that as part of the overhaul, a new guard house was installed on the other side of the driveway. This change was made less than one month after Mr. Manchack's accident, and the new scale is set off with a lower curb. Mr. Jackson testified that this overhaul *652 was performed because in random testing by a government agency, the old scale failed certification.
Both sides introduced copies of Occupational Health and Safety Administration ("OSHA") regulations, 29 C.F.R. §§ 1910 et seq. Manchack argued that the scale and curb violated these regulations, among others:
(1) § 1910.24(b) requires that fixed stairs be provided for access from one structure level to another where operations necessitate regular travel between levels;
(2) § 1910.24(e) sets out an acceptable angle of stairway rise;
(3) § 1910.24(f) requires stair treads to be reasonably slip-resistant;
(4) § 1910.144 requires yellow safety color code marking for designating caution and for marking physical hazards such as striking against, stumbling, falling and tripping; and,
(5) § 1910.37(j) requires that where a means of egress is not substantially level, differences in elevation must be negotiated by stairs or ramps.
The plaintiff tendered John Dorgan as an expert in safety engineering. The trial court refused to accept him as an expert for the reasons outlined below. As a fact witness, however, Mr. Dorgan testified that the scale, curb and guard house did not meet the OSHA regulations cited above.
By written opinion the trial court noted "a number of OSHA regulations which were violated," but declined to consider them as Mr. Manchack was not Willamette's employee. See 29 U.S.C. § 654. The court then summarized the law of strict liability and negligence, identifying as "the only pertinent inquiry" whether the curb posed an unreasonable risk of harm. Citing Shipp v. City of Alexandria, 395 So.2d 727 (La.1981), the court found that neither the position of the curb nor the curb itself posed such a risk. Although the construction was "less than ideal," the curb served as a guide and to prevent sharp drops from the roadway; it was also easily observed. The court therefore dismissed Mr. Manchack's claims.

OSHA REGULATIONS
By his first assignment, Mr. Manchack argues that the trial court erred in refusing to consider evidence of OSHA violations, which are relevant to the issues of negligence and strict liability.
The trial court was correct in stating that the Occupational Safety and Health Act, which authorized the promulgation of OSHA regulations, governs only employers and employees, and thus does not create a private cause of action by a non-employee. 29 U.S.C. § 654; Melerine v. Avondale Shipyards, Inc., 659 F.2d 706 (5th Cir.1981). This limitation, however, does not end the inquiry. The regulations set out safety standards which affect the condition of work place premises and could be invoked by a person like Mr. Manchack but for his status as a non-employee.
Louisiana courts have recognized that "while statutory violations are not in and of themselves definitive of civil liability, they may be guidelines for the court in determining standards of negligence by which civil liability is determined." Smolinski v. Taulli, 276 So.2d 286, 289 (La. 1973); Greene v. Wright, 365 So.2d 551, 559 (La.App. 1st Cir.1978); see also Horton v. Valley Electric Membership Corporation, 461 So.2d 375, 379 (La.App.2d Cir. 1984). Under this reasoning, OSHA standards are certainly relevant to the safety of a work place, even if the injured party is not an employee. In fact, the court in Melerine, supra, explained that a plaintiff "may properly offer a statute or regulation [such as OSHA] as evidence of a defendant's negligence even when that statute or regulation cannot be used to establish negligence per se." 659 F.2d at 713. Professors Keeton and Prosser summarize the concept as follows:
[W]here the statute does set up standard precautions, although only for the protection of a different class of persons,... this may be a relevant fact, having proper bearing upon the conduct of a reasonable man under the circumstances, *653 which the jury should be permitted to consider. There is, in other words, a statutory custom, which is entitled to admission as evidence.
W. Keeton, et al., Prosser and Keeton on the Law of Torts § 36, at 231 (5th ed. 1984).
This supports the argument that OSHA regulations set conditions or standards for work place environments. Violations of the regulations are intuitively relevant as evidence that premises are unreasonably dangerous, though they cannot be used as conclusive proof. Melerine, supra.
However, the particular regulations in question must be factually appropriate. The OSHA regulations cited by the plaintiff primarily concern specifications for stairs and are thus inapplicable to the present case. The provision concerning color coding, while arguably applicable, cannot avail the plaintiff here. As Mr. Manchack acknowledged that he was fully aware of the curb's presence, height, and wet condition, a cautionary yellow line would not have warned him of any hazards of which he was unaware.
This assignment of error does not present reversible error.

EXPERT WITNESS
By his second assignment, Mr. Manchack contends that the trial court abused its discretion in refusing to admit the proffered opinion testimony of Mr. John Dorgan, who was qualified by knowledge, training and experience to assist the court in the field of industrial safety. Actually, counsel tendered him as an expert in safety engineering, loss prevention and hazard identification. After voir dire, Willamette objected that Mr. Dorgan was not qualified by training, education or experience to testify as an expert; the court sustained the objection. Plaintiff's counsel conducted further voir dire, during which the court remarked, "I can read those OSHA regulations as well as anybody," and again sustained the objection.
Article 702 of the Louisiana Code of Evidence provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Experience alone is sufficient to qualify a witness as an expert; a college degree is not required. Belk v. Montgomery Ward and Company, Inc., 501 So.2d 1008 (La.App.2d Cir.1987). The trial court has broad discretion in determining whether to qualify a witness as an expert. LSA-C.E. art. 702, comment (d). However, this discretion is not unlimited. Adams v. Chevron U.S.A., Inc., 589 So.2d 1219 (La. App. 4th Cir.1991), writs denied, 592 So.2d 414, 415 (La.1992), and discussion therein.
Mr. Dorgan testified that he was a high school graduate with no college degree and no published papers on industrial accident prevention to his credit. However, he worked for petrochemical companies Texaco Chemical, Inc., and Olin Corporation from 1948 until 1986. From 1968 until 1975, he was assistant safety supervisor for the Texaco plant in Port Neches, Texas; from 1975 until 1981, manager of safety and loss prevention at the Olin plant in Lake Charles, Louisiana; and from 1981 until 1986, chemicals group manager for loss prevention and safety training. During this time he attended training seminars with the National Safety Council in Chicago. Although he has no college degree, he has been an instructor at Lamar University, teaching an accredited course in safety and loss prevention, and a guest instructor for over 15 years at Texas A & M's Industrial Fireman Training School. He is registered as a professional safety engineer in California and belongs to the American Society of Safety Engineers. Since 1986, he has worked as an independent safety and loss consultant, contracting mainly with chemical plants in South Louisiana.
This synopsis of Mr. Dorgan's credentials shows that he has the experience and training to qualify as an expert in the field of industrial safety. We find that his *654 qualifications are at least as good as those of Captain Torrence, the witness in Adams v. Chevron U.S.A., supra, whom the trial court refused to accept as an expert; the court of appeal reversed. We are constrained to hold that in the instant case the trial court abused its broad discretion in ruling that Mr. Dorgan could not express opinion testimony.
However, any error in this regard was clearly harmless. The trial court allowed Mr. Dorgan to answer numerous questions pertaining to the OSHA regulations as a "fact witness." In this testimony, Mr. Dorgan fully expressed his opinion that the OSHA regulations applied to the Willamette premises and that Willamette had failed to comply with the regulations in several different aspects. The trial court was therefore able to fully ascertain the witness' opinion on this issue. Nonetheless, the trial court, as the trier of fact, retained its great discretion to accept or reject the testimony of Mr. Dorgan like any other witness. Durkee v. City of Shreveport, 587 So.2d 722 (La.App.2d Cir.1991), writs denied, 590 So.2d 68 (La.1991).
Therefore, we find that this assignment of error does not present reversible error.

LIABILITY OF WILLAMETTE
By his third assignment of error, Mr. Manchack argues that the trial court erred in considering only the condition of the curb, and not Willamette's negligent failure to follow its own safety program, as the cause of the injury. By his fourth assignment, he also asserts that the court erred in ascribing the accident entirely to plaintiff fault, when the unreasonably dangerous condition of the curb was a substantial factor in causing the injury. We construe both of these assignments as attacking the trial court's ruling on the issue of defect.
Under a theory of either negligence or strict liability, the plaintiff has the burden of proving the following: (1) that the defendants had custody of the property causing the damage; (2) that the property was defective because it had a condition that created an unreasonable risk of harm; and (3) that the defect was the cause in fact of the injury. Barnes v. New Hampshire Insurance Company, 573 So.2d 628 (La.App.2d Cir.1991). Under a negligence theory, the plaintiff must also prove that the owner or custodian knew or should have known of the unreasonable risk of harm posed by the property. Barnes, supra.
To determine whether a particular risk is unreasonable, the intended benefit of the thing must be balanced with its potential for harm and the cost of prevention. Socorro v. City of New Orleans, 579 So.2d 931 (La.1991). The burden is on the plaintiff to prove that the thing is defective, i.e., that it poses an unreasonable risk of harm. Shipp v. City of Alexandria, supra.
Evidence of the absence of other accidents at the same place is relevant and admissible as tending to show that the place was not dangerous and that the defendant did not have actual or constructive knowledge of a dangerous condition. Crochet v. Freeman, 504 So.2d 1064 (La.App. 1st Cir.1987).
An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
In this case, there is no serious contest concerning the plaintiff's injury, Willamette's custody of the curb, and the question of causation. The issue is defect. The trial court rejected this claim for a lack of evidence, citing Shipp, supra. The court noted the curb's function, to aid drivers in lining up their rigs on the scale and to prevent severe drop-offs onto the dirt.
Our examination of the record convinces us that the curb was not unreasonably dangerous. There was no defect in the curb itself, which was obviously in place to help the drivers position their rigs on the scales. The mere presence of the curb itself was equally obvious to the plaintiff, as was the fact that the curb was not designed to be walked upon or stepped on *655 by the drivers. By his own admission, not only could the plaintiff plainly see the curb, but he could also see that the curb was still wet following an earlier rain. Furthermore, there were several other ways to reach the guard house without walking or stepping on the curb, i.e., walking to the end of the curb near the front of the truck or walking alongside the truck toward the back of the truck.
Another important factor is the absence of any other similar accidents in the 20 years since the scales were first put in use. We note that the plaintiff himself had previously been to the site almost a half dozen times without mishap.
Consequently, in the absence of an unreasonably dangerous condition, we find that Willamette is not liable under a theory of strict liability or negligence.
These assignments of error are without merit.

CONCLUSION
For the reasons expressed, the judgment dismissing the plaintiffs' claims is affirmed. All costs are assessed to the plaintiffs/appellants.
AFFIRMED.
NORRIS, J., dissents with written reasons.
NORRIS, Judge, dissents.
I respectfully dissent from the majority's opinion. In my view, each of Manchack's arguments presents reversible error.
First, the majority properly rejects Willamette's argument that OSHA regulations do not apply because of Manchack's status as a non-employee. The "status" argument is all the more invalid here because Willamette exercised a high degree of control over the non-employee drivers' actions. When drivers like Manchack are required to negotiate a high curb and enter an elevated work area, Willamette owes the duty to provide them with reasonably safe premises.
With this said, however, the majority curiously dismisses the regulations because they "primarily" concern stairs. True, there were no stairs on the premises in question. However, the concrete curb was some 17" high, and the threshold of the guard house was 4" higher than that. R.p. 168. This is a situation of "access from one structure level to another" in which fixed stairs are mandated. 29 C.F.R. §§ 1910.24(b), 1910.37(j). The stairs must meet certain specifications. 29 C.F.R. §§ 1910.24(e), (f). To absolve Willamette of liability for failing to meet "specifications for stairs," when the regulations plainly require stairs to be present, is to overlook the letter of the regulations.
Second, the majority properly holds that the trial court erred in refusing to accept Mr. Dorgan as an expert. Admittedly the trial court mitigated this error by giving Mr. Dorgan great latitude in testifying as a fact witness. R.pp. 168-174. However, the proffered opinion testimony, which the trial court did not consider, is much more detailed as to Willamette's failure to implement its safety program. R.pp. 208-213. As a fact witness, Mr. Dorgan testified only that there was no record of compliance. As an expert, he testified he had examined the program and found it to be "basically good"; and that had it been implemented, the defect would have been noticed and corrective measures initiated. This unrebutted evidence as to causation is, in my opinion, highly relevant to the issue of Willamette's negligence.
These evidentiary errors contributed to the trial court's finding that Willamette was not liable. I believe that when this evidence is properly admitted and considered, it mandates a finding of liability, and I would so rule. Although the discussion on this point is rather sparse, the majority suggests that because the curb was "equally obvious" to Manchack as to Willamette, and because the "plaintiff could plainly see it," Willamette owed no duty to protect Manchack from the danger. The Supreme Court has repeatedly rejected this rationale. See Socorro v. City of New Orleans, 579 So.2d 931, at 941 (La.1991); Murray v. Ramada Inns Inc., 521 So.2d 1123, at 1133 (La.1988). The alleged utility of the curb, also cited by the majority, it not as clear from this record as the majority states. I am aware of no witness who testified the *656 purpose of the curb was to "help drivers position their rigs on the scales." In fact, a new scale was installed shortly after this accident and it has virtually no curb. The most impressive fact is that this high curb was placed squarely in the driver's most direct path from his rig to the guard house. This made it unreasonably dangerous. See and compare Thompson v. American Nat'l Fire Ins. Co., 617 So.2d 171 (La.App.3d Cir.1993).
Manchack safely negotiated the curb and guard house on prior occasions. While this fact does not alter the inherent condition of the premises or Willamette's negligent failure to correct it, it does diminish Manchack's recovery for his comparative fault on the night of January 18, 1990. See La.C.C. art. 2323. This case is ideal for the application of comparative fault. Under the principles of Watson v. State Farm, 469 So.2d 967 (La.1985), I would assess Manchack with 70% of the fault for this accident and render judgment in his favor for 30% of the stipulated damages.
I respectfully dissent.

APPLICATION FOR REHEARING
Before SEXTON, NORRIS, LINDSAY, HIGHTOWER and VICTORY, JJ.
Rehearing Denied.